# Henry B. Stone and Wilson S. Chapman v. Milo G. Kellogg.

1. STOCKHOLDERS—*Of Corporation—Right to Inspect Records.*—Directors and stockholders of incorporated companies have a right to differ with the board of directors in respect to the proper policy to be pursued in the management of the company, and a right, by actual inspection, to know what its records show it is doing.

2. CORPORATIONS—*Access of Officers, etc., to Books and Papers.*—The books and records of an incorporated company do not belong to any of its officers and agents as such; they are the property of the company of which each director is a trustee, and bound to serve equally the interests of all the *cestuis que trust.*

3. SAME—*Rights of Directors.*—The majority of a board of directors can not exclude the minority from knowledge of what the company is doing, or from access to its files and records.

4. SAME—*Duty of Director to Keep Books—Right of Inspection.*— It is the duty of the directors or trustees of stock corporations, to cause to be kept, at the principal office or place of business in this State, correct books of account of all business, and all stockholders in such corporations have the right, at all reasonable times, by themselves or their attorneys, to examine the records and books of account of such corporations.

5. SAME— *Right of Inspection—Suspicious Stockholders.*— The fact that a director of a corporation is suspicious that its affairs are not properly or judiciously managed, is no reason why he should be denied the right to examine its records and books of account.

MANDAMUS.—To compel a corporation to permit access to its books. Appeal from the Circuit Court of Cook County; the Hon. RICHARD W. CLIFFORD, Judge, presiding. Heard in this court at the October term, 1895. Affirmed. Opinion filed February 11, 1896.

STATEMENT OF THE CASE.

The appellee, Kellogg, filed his petition in the Circuit Court for a writ of mandamus, alleging that the appellant Stone was the president, and the appellant Chapman was the secretary, of the Central Union Telephone Company, an Illinois corporation, of which the petitioner was a director and stockholder, and praying for a writ to compel these officers to exhibit to him certain books and documents belonging to the company. The defendants filed their separate answers to which the petitioner demurred, and the court sustained such demurrers; and the defendants standing by their answers, a peremptory writ was awarded and the defendants appealed. The answers expressly deny many of the allegations of the petition.

The answers admit that the Central Union Telephone Company is an Illinois corporation, conducting a telephone business in Illinois and other States; that the defendant Stone is president, and defendant Chapman secretary and treasurer, and that the petitioner, Kellogg, is a stockholder and director, and has been a director from the organization of the company; and that the correspondence set forth by way of exhibits to the petition, took place as stated.

Accompanying the petition was the following correspondence:

EXHIBIT A.

CENTRAL UNION TELEPHONE COMPANY,

PRESIDENT'S OFFICE,

Telephone Building, 203 Washington street.

CHICAGO, May 26, 1894.

M. G. Kellogg, Esq., 135 East 47th street, Chicago.

DEAR SIR: On trying to see Mr. Norman Williams, I find that he is out of town and not expected to return for about ten days. I should very much like to defer a decision on the matter we were talking about until his return, and hope it will be agreeable to you for me to do so.

Very truly yours,

H. B. STONE, President.

EXHIBIT B.

135 East 47th street, Chicago, May 29, 1894.

H. B. Stone, Esq., Prest.

DEAR SIR: I am willing to wait until Mr. Williams' return before you decide on the matter referred to in yours of the 20th inst.

Yours truly,

M. G. KELLOGG.

EXHIBIT C.

135 East 47th street, Chicago, June 18, 1894.

H. B. Stone, Esq., Prest. Central Union Tel. Co., Chicago, Illinois.

DEAR SIR: For two or three weeks you have been considering whether you would allow me, as a stockholder in the Central Union Telephone Company, to inspect certain books and papers of the company. I asked particularly to see the general contract between the Central Union and the American Bell Telephone Companies, and the minute book of the Central Union Telephone Company, and stated that I might wish to see other books and papers of the company. At your request, I indicated in a general way my reasons for the request. On the 14th inst. you definitely refused to allow me to inspect the contract and the minute book referred to above.

I will now definitely ask and require of you, as the president of the Central Union Telephone Company, and of the company, that I be allowed at times, convenient, so as not to interfere with the routine work of its officers and employes, to look over the books and papers of the Central Union Telephone Company, which I will indicate as closely as I can and sufficient for your identification, as follows:

1. The block or general contract between the Central Union Telephone Company and the American Bell Telephone Company.

2. Any other contract, if such there exists, between said Central Union and American Bell Telephone Companies.

3. Any contract or contracts which may exist between the Central Union Telephone Company and the American Telephone and Telegraph Company, which latter company, as is generally understood, is owned by said American Bell Telephone Company.

4. Any written letters or papers, if such there exist, which embody in substance any contract or working arrangement between the Central Union Telephone Company and either said American Bell Telephone Company or said American Telephone and Telegraph Company.

5. The minute book of executive committee of the Central Union Telephone Company.

6. The by-laws of the Central Union Telephone Company, either copied out or in such book of the company as contains them.

7. The stock books of the Central Union Telephone Company.

8. The list of stockholders of the Central Union company, with their addresses. The last quarterly dividend list will, I think, answer this purpose.

9. The circular letter of the American Bell Telephone Company with reference to rental price of magneto-telephones issued by that company about January 30, 1894, and received by the officers of the Central Union company, on its issue.

10. The amount or amounts paid to or credited to the

account of the American Bell Telephone Company by the
Central Union company for the magneto-telephones used
by the latter company since January 30, 1894. Under this
head I desire to know the monthly rental paid or credited
for the use of such telephones, together with the number of
telephones on which such rental was figured. A statement
of the same by the treasurer of the company will answer.
Otherwise I desire to inspect the entries and papers which
embody the information.

12. The books and papers of the company which show
the number of new exchanges established by the company
since January, 1891, together with their number of sub-
scribers, revenue and expenses fairly chargeable to the
same, to the extent and for the purpose that I may person-
ally know whether or not said exchanges or any of them
are profitable to the Central Union Telephone Company,
taking into consideration the amount of capital invested, or
are merely profitable to the American Bell Telephone Com-
pany on account of the revenue which the latter company
receives from the rental and royalty which it receives on
its telephone instruments used in said exchanges.

13. The general and financial books of the company, to
the extent that I may thoroughly understand the operation
of the company's business, its management and profitable-
ness. Under this head I ask for facilities for as careful and
thorough an investigation of the company's affairs as any
stockholder has or may be entitled to—as, for instance, the
American Bell Telephone Company. I know of no reason
why the American Bell Telephone Company, the owner of
a majority of the stock of the Central Union company,
should be allowed to inspect the books and papers, and
understand the business affairs and management of the com-
pany, and I, being, as I believe, the next largest stock-
holder of the Central Union, should not have equal latitude
of inspection and investigation. You asked me verbally for
my motives for seeking this information, and for wishing
to inspect the company's books and papers and thereby
understanding its business. I told you verbally and in a

general way what my motives are. They are to know how this business of the Central Union Telephone Company, in which I have invested a large portion of my fortune, is being managed, and to estimate what are its present status and future prospects as an investment. They are also to determine whether the business of the Central Union Telephone Company is being managed solely in the interest of the Central Union company, or whether the American Bell Telephone Company, the owner of the majority of the stock of the Central Union, is obtaining advantages from rental of telephones and otherwise, to which it is not legally entitled, and if so, to determine my rights and interests as a stockholder of the Central Union company.

This brings me to a subject which I reluctantly enter on, but which I feel called upon to do frankly and without feeling, as a matter of business, and I ask you to consider it in the same light.

The majority of the stock of the Central Union Telephone Company is owned by the American Bell Telephone Company, and the latter company has interests in the business of the Central Union which are not identical with the interests of the other stockholders. For instance, it asks and receives rental and royalties on telephones, which aggregate a very large amount yearly, which payments are an expense to the Central Union company, while they are a profit to the American Bell company. Until the latter part of January last, these payments were regulated by contracts between the two companies substantially entered into before the Bell company became the majority stockholders. Since January 30th the contract has substantially worked itself out, as far as magneto-telephones are concerned, as the patents have confessedly expired on these instruments. A new arrangement for the supply and use of magneto-telephones then became necessary. Mr. Hudson, the president of the American Bell, stated on February 15th last, that this question was under consideration between the Bell company and its licensees. I state to you frankly that I do not believe and do not consider that either you, as president, or that the execu-

tive committee of the Central Union Telephone Company, can fairly and in an unbiased manner, and in the sole interest of the Central Union company, represent the latter company in an arrangement or negotiation which affects the question of the amount to be paid for rental of telephones by the Central Union to the Bell company, or in any other matter in which the Bell company has an interest substantially different from or adverse to that of the other stockholders of the Central Union company. I state to you my reasons for this belief.

You yourself, so far as I know, own practically no stock in the Central Union Telephone Company. As president of the Central Union and Chicago telephone companies, you receive a very large salary; in fact, as I understand, much larger than others in the electrical field who are your superiors in knowledge and acquirements receive, as, for instance, Col. Clowry, of the Western Union, or Mr. E. M. Barton, of the Western Electric. Your salary income in the positions you occupy is, I presume, much larger than any which you previously received. On this salary, as I assume, depends largely your means of support and the style and position which you and your family occupy. The continuance of this salary depends on the will of the American Bell Telephone Company. I leave it to your own good sense and conscience to answer whether you can fairly, conscientiously and unreservedly, in the interest of the Central Union, represent the latter in negotiations or arrangements with the Bell company in a matter which is of great moment or interest to the Bell company. My own belief is that you can not do so—that it is beyond human nature for you to do so.

Mr. Norman Williams, and his associates in the law business, are I believe, the legal advisers of the Western Electric Company and the Central Union and Chicago Telephone companies, all controlled in fact by the Bell Telephone company. I presume that they are also the legal advisers of the American Bell Telephone Company itself in its business matters in this vicinity. Mr. Williams is largely interested in the Chicago Telephone company and

probably values his interests there more than his interest in the Central Union. He naturally wishes to shape his relations with the Bell company so as to preserve his influence with it to the advantage of his interests in the Chicago company and of his professional work. On account of these professional and business interests I do not consider that he can unreservedly represent the Central Union as against the Bell company in important matters in which the interests of the two companies are antagonistic.

Colonel R. C. Clowry has nearly if not practically sold out his interest in the Central Union company. Messrs. J. Russell Jones and C. R. Cummings, the other members of the exective committee, though men of business, judgment and success, have practically no knowledge of the fundamentals of the telephone business, and I presume have neither of them read or become familiar with our contract with the American Bell company. They can have no fundamental opinion as to the relations between the two companies, and must get their ideas second-hand; and as the business is now organized and managed, they can obtain no clear insight into the matter, unless I shall be able to obtain information and give them enlightenment on the subject. One or both of them are also, I think, largely interested in the Chicago Telephone Company, and belong to its board of directors and executive committee.

You told me on the 14th inst. that the Central Union Telephone Company was paying rentals on magneto-telephones according to the Bell Telephone circular of about January 30, 1894; which rental amounts to a maximum yearly rental of $2.50, and probably an average yearly rental of about $2 on an unpatented instrument which costs $1.75 or less purchased outright. There are about 25,000 of such instruments used by the Central Union. The matter of paying such rentals was not brought before the board of directors, and I understood you to say was not brought before the executive committee for approval. I understand that you and the treasurer of the company, or both of you—practically the creatures of the Bell company, dependent on

the Bell company for your positions, and therefore for your support—have without authority assumed the responsibility of paying the Bell company these rentals, aggregating perhaps about $4,000 monthly. This I consider to be a gross abuse of your positions and duties as officers of the Central Union. As I remember the by-laws of the Central Union, the treasurer is placed under your control, and has practically no discretion except to do your will. If this is so, you are the responsible man for what I believe to be the illegal and unauthorized action of the officers. It is partly for the purpose of verifying this impression that I desire to look over the by-laws.

I learned a short time ago, by the merest chance, that the Central Union company had entered into a contract or agreement with the American Telephone and Telegraph Company, by which the Central Union substantially gave up to the American Telephone and Telegraph Company certain rights for extra-territorial business, which the Central Union had obtained in its contract with the American Bell Telephone Company. These rights are a part of the rights for which the Central Union gave said Bell Telephone company thirty-five per cent of its capital stock, aggregating about two million three hundred thousand dollars ($2,300,000) of the capital stock of the Central Union company, given to the Bell company for perpetual contract rights. The American Telephone and Telegraph Company is commonly understood to be owned by the American Bell Telephone Company. The arrangement, therefore, amounts to a transfer or surrender to the Bell Telephone company, under some terms which I and practically all the stockholders of the Central Union company are unacquainted with, of certain of the rights for which the Central Union gave the Bell Telephone company such a large amount of its capital stock. The directors, as I have practically indicated, and therefore the other officers of the Central Union company, owe their positions to the vote of the majority stock owned by the Bell company in the Central Union. This transaction is or verges on a fraud.

You substantially told me that the arrangement with the American Telephone and Telegraph Company could be terminated at the option of the Central Union company. Although nominally so terminable, practically of course it is only terminable at the will of the Bell Telephone company. I do not say that the terms of this arrangement may not be such that I would not personally vote for it. Not knowing the details of the arrangement I can not state as to this. As the whole matter practically relates to a transaction between the Bell Telephone and Central Union companies, founded on the fundamental working contract between the two companies, by which the Bell company received thirty-five per cent of the capital stock of the Central Union company and substantially modifies that contract, and as the persons who now happen to be the directors of the Central Union company owe their places to the fact that the Bell company's ownership of stock in the Central Union was the majority of stock voted at their election, I think that the arrangement should not in fairness have been entered into until it had been ratified and approved by a majority of that part of the stock of the Central Union which is not owned by the Bell company, and that the same amount of stock should have the power to terminate the arrangement.

I do not know whether the arrangement between the Central Union and the American Telephone and Telegraph Company was entered into by you on your own responsibility, as the president of the Central Union company, or whether it was approved or authorized by the executive committee. You know whether it was to keep this matter or to keep some other matter from the knowledge of the stockholders of the Central Union company that you refused me the inspection of the minute book.

With this full statement of the matter you will understand clearly my attitude. I will say in conclusion that I shall try to settle this matter among ourselves, providing you allow me to have the information which I ask for.

My request and demand for the information mentioned

above, is made both collectively and severally; that is, if you refuse to give me all the information, I ask for the information on each of the particular heads referred to.

I will add that this information is sought by me both as a stockholder and director, and solely with the view of ascertaining the facts pertaining to my large investment in the company and of your management thereof. I have no interests adverse to those of the Central Union Telephone company, and desire only to secure for that company an honest and efficient management, having in view solely the interests of that company, and to ascertain the actual facts in order that I may know whether it is now so managed.

I would like to have you answer this communication at your earliest convenience. As the matter has been on your mind for about three weeks, and you have already taken counsel on the subject, I suggest that it will probably be convenient for you to give me an answer as early as the end of this week, or say, on the 25th inst.

Yours truly,<br>M. G. KELLOGG.

### EXHIBIT D.

CENTRAL UNION TELEPHONE COMPANY,<br>PRESIDENT'S OFFICE,<br>Ashland Block, Chicago, June 20, 1894.

M. G. Kellogg, Esq., 135 E. 47th street, Chicago.

DEAR SIR: I have your communication of the 18th about Central Union matters, and as it is silent on much that I personally stated to you, and you stated to me, I suppose I must consider and take it along with our conversation, but I wish again to call attention to the fact that I am only one of the directors of this corporation; I am, as its president, its executive officer only, which means that I am the executive officer of the board of directors.

There can be, and I recognize no other authority or direction in its affairs than the board. The executive committee are, indeed, only an intermediate agency for the temporary purposes of the board of directors, to whom they must re-

spond. My statement to you before and now is, that if you entertain complaints such as you specify, it is your duty as director to bring them before the board of directors. The most substantial, probably, of these complaints relate to matters of business judgment, which it is the duty of the board of directors to pass upon, as it is my duty to follow their judgment and obey their direction. At their next meeting I shall take occasion to lay all your complaints before them, and I offer, if you desire it, to call them together now for this purpose.

It is not my wish nor intention to withhold from you any facts relating to this company's affairs, which the law makes it my duty, as president, to furnish to a stockholder. I do not know just what facts may properly be included in what the law specifies as the "records and accounts" of the company; but the board of directors may decide. I promise you to obey their direction.

Yours truly,

H. B. Stone, President.

Exhibit E.

Chicago, June 21, 1894.

H. B. Stone, Esq., Prest. Central Union Tel. Company, Chicago, Illinois.

Dear Sir: Answering yours of June 20, 1894, I have to say that I do not understand your meaning when you state that you suppose you are to consider our conversations along with my communication of the 18th inst. There was nothing in these conversations that added to or varied the position which I took in the communication referred to. That there may be no misunderstanding, I suggest that the demand be restricted to the writing. Doing this, you will please understand, that I demand an inspection of records and books of account of the Central Union Telephone Company; that I make this demand in my right as a stockholder and director of said company; that I make it of you as the president and executive officer of the corporation.

I do not understand that I have anything to do with the

board of directors, or that they can limit or restrict my rights or enable you to do so. When I have obtained the information which I seek, I shall be better able to submit to them my reason why they should change their policy as to any matter of business judgment, or any policy which you, as president, or the executive committee, may have inaugurated without their knowledge or consent, or perhaps enter upon a policy of administration in the sole interest of the Central Union Telephone Company, rather than one taking into consideration the interest of the American Bell Telephone Company.

You will therefore please accede to my demand or refuse to do so at the time heretofore named in mine of the 18th inst., at which time I shall be prepared to enter upon my investigation for the purposes heretofore stated.

Yours very truly,<br>M. G. KELLOGG.<br>CHICAGO, June 21, 1894.

Mr. W. S. Chapman, Secy. and Treas. Central Union Tel. Co., Chicago, Illinois.

DEAR SIR: Please take notice that on the 25th instant I shall present myself at the office of the Central Union Telephone Company, in Ashland Block, Chicago, for the purpose of examining the records and accounts of that company, such records and accounts being largely under your immediate control. I desire to make this examination during business hours and subject to the reasonable requirements by the officers and employes of the company in the discharge of their work, and to continue the examination on successive days until the same shall have been completed to my reasonable satisfaction.

On the 18th instant I mailed a communication to Mr. H. B. Stone, President of the Central Union Telephone Company, at its Chicago office, in which I enumerated my requirements in greater detail. For your further information I refer you to that communication.

Yours truly,<br>M. G. KELLOGG.

WILLIAMS, HOLT & WHEELER, attorneys for appellants.

That the right of inspection by a director depends on considerations appealing to the discretion of the court, see Rosenfeld v. Einstein, 46 N. J. L. 479 ; Hatch v. City Bank, 1 Rob. La. 470 ; Hemingway v. Hemingway, 58 Conn. 443.

The right should be used with great care, and the reasons for its exercise must be clear and cogent.    People v. L. S. & M. S. Ry. Co., 11 Hun 1 ; People v. N. P. Ry. Co. (N. Y. Superior Court) note to 18 F. R. 471.

The express limitation is that inspection shall be made at reasonable times.    "The implied limitation is that it shall not be for improper or unlawful purposes or from idle curiosity."   Hemingway v. Hemingway, 58 Conn. 443.

In Phenix Iron Co. v. Commonwealth, 105 Pa. St. 111, while the right of inspection was allowed, it was expressly held not to be an absolute but a qualified right.    It must be exercised "for a definite and proper purpose, at reasonable times."    And again, "the necessary limitations practically prevent the exercise of the right for speculative purposes or gratification of curiosity."

In a later case in Pennsylvania, where a constitutional provision granting the right of inspection was invoked, it was held that such right was not absolute.    The court says, referring to a demand for the privilege of copying the list of stockholders, that the constitution does not confer any such right, " but even if it did not confer such a right, we hold that it could only be exercised for a reasonable and proper purpose;" and the Phenix case is reaffirmed in so far as it holds that "the interests of all corporators require that the writ shall not go at the caprice of the curious or suspicious." Com. v. Empire Pass. Ry. Co., 134 Pa. St. 237.

Statutes giving all persons the right to inspect county records, do not authorize such inspection by persons desiring to copy the records for the purpose of engaging in the abstract business.    Bean v. People, 7 Col. 200; Buck v. Collins, 59 Ga. 391; Cormack v. Wolcott, 37 Kas. 391; Weber v. Townley, 43 Mich. 534; see Burton v. Tuite, 78 Mich.

It is only by invoking the peremptory terms of a statute

that such a right could possibly be claimed, and such a statute will not be construed beyond its terms.    A few decisions out of many to this effect may be cited.

A statute giving power to require books to be brought into the State does not cover papers and memoranda.    Huyler. v. Cragin Cattle Co., 42 N. J. Eq. 139.

A statute requiring all books of a corporation to be kept within the State, does not cover books showing transactions in another State.    Pratt v. Meriden Cutlery Co., 35 Conn. 36.

"Books of account" cover books showing current commercial transactions.    Lyon v. American Screw Co. (R. I.), 17 Atl. Rep. 61.

Under a statute giving the right to inspect books an application for all records and papers is too broad.    People v. Walker, 9 Mich. 328.

Books of account are not limited to the stock-ledger and transfer-book, but cover the general books showing the corporate business.    State v. Bergenthal, 72 Wis. 314.

Under a statute giving the right to inspect " by-laws and records," an application for ledger, journal, stock-journal and transfer-book is good only as to the two latter.

" Ordinary books of accounts are not records."    Lewis v. Brainard, 53 Vt. 510.

" The writ should not extend to any books and papers other than such as contain information upon the subjects specified in the petition."    Com. v. Phœnix Iron Co., 105 Pa. St. 120.


CHARLES H. ALDRICH, attorney for appellee, contended that Kellogg's rights as a stockholder were :

First, at common law.    Cook on Stock, Stockholders and Corporations, says :    " The stockholders of a corporation had, at common law, a right to examine, at any reasonable time, any one or all of the books and records of the corporation.    This rule grew out of analogous rules applicable to public corporations and to ordinary copartnerships, the books of which, by well established law, are always open to the in-

spection of the members. Vol. 1, Sec. 511, citing Lewis v. Brainard, 53 Vt. 519; Com. v. Phœnix Iron Co., 105 Pa. State 111; Huyler v. Cragin Cattle Co., 40 N. J. Eq. 392.

This general right is not denied at common law, all the authorities conceding it. Spelling on Private Corporations, Vol. 2, Secs. 656, 657; Spelling on Extraordinary Relief, Vol. 2, Secs. 1610, 1612, 1613; High on Extraordinary Legal Remedies, Secs. 308, 309, 310; A. & F. R. R. Co. v. Rowley, 9 Fla. 508; Queen v. Maraguita M. Co., 1 El. & El. 289; King v. Taylor Co., 2 Barn. & Ad. 115; In re Burton and the Saddlers Co., 31 L. J., Q. B. 62; King v. Wilts and B. Canal Nav. Co., 3 Ad. & El. 477; King v. Clear, 4 B. & C. 889; Queen v. Grant Canal, 1 Irish Law Reports, 337; Birm. Bristol Co. v. White, 12 B. 282; Mutter v. Eastern & Mid. Ry. Co., 38 Chan. Div. 92; 105 Pa. St. 111; Id., 113 Pa. St. 563; Angell & Ames Corp., Sec. 681; Redfield on Rys. 227; Grant on Corp. 311; 2 Phillips on Ev. 313; Martin v. Bienville Oil Works, 28 Lou. Ann. Rep. 205; Foster v. White, 86 Ala. 467; Winter v. Baldwin, 89 Ala. 483; State v. L., S. & F. R. R. Co., 29 Mo. App. 301; State v. Sportman's Park Ass'n, 29 Mo. 326; State v. Bergenthal, 72 Wis. 314.

Second. Rights as a stockholder under the statute.

The right of a stockholder at common law to inspect the books being as above shown, I next inquire what change has the Illinois statute made?

Section 13, chapter 32, Revised Statutes of Illinois, is as follows: "It shall be the duty of the directors or trustees of every stock corporation to cause to be kept at its principal office or place of business in this State, correct books of accounts of all its business, and every stockholder in such corporation shall have the right at all reasonable times, by himself or by his attorney, to examine the records and books of accounts of the corporation."

This statute is imperative in its terms, and I insist that it makes the right of the stockholders to an inspection of the books and records of the company an absolute one without restriction or condition. Statutes of the same kind have been so construed in Alabama, Missouri and Wisconsin, and

I know of no case to the contrary. Foster v. White, 86 Ala. 467; Winter v. Baldwin, 89 Ala. 483; State v. L. S. & F. R. R. Co., 29 Mo. App. 301; State v. Sportsman Park Ass'n, 29 Mo. 326; State v. Bergenthal, 72 Wis. 314.

MR. JUSTICE WATERMAN DELIVERED THE OPINION OF THE COURT.

The petition after setting forth attempts of the petitioner to obtain an inspection of the books of the company, and also setting forth the correspondence admitted to have taken place, contains the following:

"That at the time fixed in said letters, to wit, June 25, 1894, the complainant called on the defendant Chapman and asked him if he had received his communication of the 21st, heretofore referred to, and would allow the complainant to inspect the records and accounts referred to in it; to which the said Chapman replied: "I regret to say that I must respectfully decline to let you see them."

To this allegation the defendant made the following reply:

"This defendant further and expressly denies that either this defendant or any other officer of said company has at any time refused to the petitioner the right to examine any of the records or accounts of said company which the petitioner was lawfully entitled to examine, either as a stockholder or director of said company. And he avers that according to his best information and belief the said petitioner is, and at all times has been, fully acquainted with all the facts which, by his petition, he represents himself as desiring to ascertain. And that the real purpose of his application for books, papers, records and accounts is not and never has been the ascertaining of any facts which the petitioner was legitimately entitled to know, but that such purpose is and always has been to discover some possible ground of attack upon said company and its management, contrary to the interests of said company, and for the private advantage of the petitioner."

This answer is insufficient. Instead of denying the alle-

gations of the petition, it takes refuge under the word "lawfully," assuming that the petitioner has no right to examine any of the records or accounts of the company which he has asked to be permitted to inspect.

The information and belief of the respondent that the petitioner is fully acquainted with the facts he desires to ascertain, is of no consequence. The question is not what the respondent is informed, or believes, as to the acquaintance of the petitioner. The court is called to consider the petitioner's right to see the records of a company of which he is a director and in which he is a stockholder.

Nor is it the province of the respondent to determine how much of the records and affairs of the company all or any of its directors may "legitimately" know; or to assume that the real purpose of a director who is endeavoring to find out what the company has done and is doing, is to discover a ground of attack upon the company and its "management," contrary to what the respondent assumes to be for the interest of the company.

Nor is the encomium bestowed in the answers upon the distinguished gentlemen, other than the petitioner, who compose the directory, material. Doubtless the majority are serving the company with fidelity and zeal; yet the petitioner has, as a director and stockholder, a right to differ with them in respect to the proper policy to be pursued in the management of the company, and a right, by actual inspection, to know what its records show it is doing. High on Extraordinary Remedies, Secs. 308, 309, 310; Spelling on Private Corp., Vol. 2, Secs. 656, 657; Cook on Stock and Stockholders, Vol. 1, Sec 511; Lewis v. Brainard, 53 Vt. 519; Huyler v. Cragin Cattle Co., 40 N. J. Eq. 392.

The books and records of the company do not belong to any of its officers and agents as such; they are the property of the company of which each director is a trustee, bound to equally serve the interests of all the *cestuis que trust*. Angell & Ames on Corp., Sec. 681; Redfield on Railways, 327; Grant on Corp., 311.

The majority of a board of directors can not exclude the

minority from knowledge of what the company is doing, or from access to its files and records.

The respondents do not pretend to have been acting under either a rule of the company or the order of a majority of the directors. The answer of one, adopted by the other respondent, contains the following attempted justification:

" This defendant shows that he has not, and never has had, any personal interest or concern in the matter of said Kellogg's demands, but that all his doings in the matter have been prompted by what he conceived to be his duty as an officer of the company. He says that so far as he has any control over the matter, he is entirely willing, as stated in his letter, Exhibit D, aforesaid, that said Kellogg should examine the "records and books of account" of the company, but that the interpretation placed upon those terms by said Kellogg in conversation with this defendant, and in his demands and letters, was so broad as to be, in the judgment of this defendant, wholly unwarranted by law, even if said Kellogg had been acting from proper motives, and with a sincere desire for the advantage of the Central Union Company, or of said Kellogg himself as a stockholder therein. This defendant shows that so far as he has had control over the matter, he felt and still feels unwilling to take the responsibility of interpreting the rights claimed by said Kellogg in the broad sense asserted by him, but was and is willing to obey any order which the board of directors might make in that behalf."

The respondents thus again assume the right to select the "records and books of account" which a stockholder and director may be permitted to examine.

The law of this State gives to neither of the respondents or a majority of the directors any such right.

Section 13, chapter 32, Revised Statutes of Illinois, is as follows:

" It shall be the duty of the directors or trustees of every stock corporation to cause to be kept at its principal office or place of business in this State, correct books of account of all its business, and every stockholder in such corpora-

tion shall have the right at all reasonable times, by himself or by his attorney, to examine the records and books of account of the corporation."

It is not merely the right of petitioner to examine the records and books of account of the company in which he is a director—it is his duty, if he has reason to think that they contain that, a knowledge of which, if obtained by him, will be of service to stockholders, the trustee of all of whom he is.

If, in Commonwealth v. Phœnix Iron Co., 105 Penn. St. 111, and Commonwealth v. Empire Pass. Ry. Co., 134 Penn. St. 237, there is intended to be announced that a "suspicious" stockholder is not entitled to the writ of mandamus to permit him to examine the books of a corporation, we can not give our assent to such doctrine. The fact that a director is suspicious that affairs are not properly or judiciously managed, is a reason why he should investigate; nor are we able to perceive any good reason why a suspicious stockholder can be turned aside with the answer that his suspicion is a mere caprice or his motives bad.

Nor are we willing to accede to the proposition that the corporation is remediless if a stockholder or director attempts to make improper use of information which by virtue of such relation he obtains. Thompson on Corporations, Secs. 4009–4012, 4016.

The allegation of the petitioner setting forth just and proper reasons for his desire to examine the records and accounts of the company is not one upon which an issue of fact can be raised by answers imputing to him base and unworthy motives.

The judgment of the Circuit Court is affirmed.